922 So.2d 263 (2006)
John M. HAMILTON, Jr., Appellant,
v.
Grace H. HAMILTON, Appellee.
No. 2D04-1105.
District Court of Appeal of Florida, Second District.
January 27, 2006.
Rehearing Denied March 16, 2006.
Philip A. McLeod, St. Petersburg, and Cynthia L. Greene of Law Offices of Greene, Smith & Associates, P.A., Miami, for Appellant.
Jane H. Grossman of Law Office of Jane H. Grossman, St. Petersburg, and William L. Penrose, St. Petersburg, for Appellee.
NORTHCUTT, Judge.
John Hamilton appeals the judgment dissolving his marriage to Grace Hamilton. He challenges only the circuit court's decision concerning custody of the parties' young daughter. We reverse the final judgment insofar as it placed primary residential responsibility for the child with Mrs. Hamilton. We affirm the judgment in all other respects.
The Hamiltons both had been married previously and had children by their former spouses. They wed in June 1997. From its early days the parties' marriage was hampered by financial difficulties and trouble blending the two families. Things were further complicated by Mr. Hamilton's 80  to 100-hour work weeks. Mrs. Hamilton, who stayed home to maintain the household, contributed her own difficulties *264 to the mix: she was a recovering alcoholic, she had a mild bipolar disorder, and one of her sons was schizophrenic. The parties' daughter was born in August 1998.
Sometime in 2000, Mrs. Hamilton began to deteriorate. After six years of sobriety, she started drinking again. Things came to a head one day in December of that year, when she declared that she no longer wanted to live. She told Mr. Hamilton that she "just want[ed] to go away," and asked him to take care of the children. Mr. Hamilton immediately took a sixty-day leave of absence from his job to stay home and tend Mrs. Hamilton and the family. When he returned to work in March 2001, he reduced his work schedule to forty or forty-five hours per week.
One day in February 2002 Mr. Hamilton arrived home to find Mrs. Hamilton passed out on the floor, unconscious from an aspirin overdose. The parties' daughter, then three and one-half years old, was asleep on a couch a couple of feet away. Thereafter, in April 2002 Mrs. Hamilton voluntarily entered residential treatment for her substance abuse and psychiatric disorder. During her inpatient stay, Mr. Hamilton served her with his petition for dissolution. From approximately February 2002 until the final dissolution judgment was entered nearly two years later, Mr. Hamilton was his daughter's primary caretaker.
The final hearing took place in November 2003. The court heard considerable testimony about each party's relative suitability as primary residential parent. Not surprisingly, much of the evidence concerned Mrs. Hamilton's substance abuse problems and her recovery. Everyone agreed that she had made good progress in coping with her alcoholism. But the evidence was in conflict about the period of abstinence necessary to predict her likelihood of recidivism. One expert testified that two to five years of sobriety is a good indicator of success; another expert opined that the first year of sobriety is critical, after which there is a significant drop in relapses. Several witnesses also discussed the effect Mrs. Hamilton's schizophrenic son might have on the parties' daughter.[1]
In reaching its decision regarding permanent primary residential responsibility, the circuit court analyzed the factors set forth in section 61.13(3), Florida Statutes (2003). In its final judgment the court made three relatively minor negative findings concerning Mr. Hamilton. First, during a financially tight period in the past, he had allowed the family's medical insurance to lapse. See § 61.13(3)(c). But it was undisputed that the insurance had been reinstated, and no one suggested that the lapse had caused the child any harm. Second, the court disapproved of Mr. Hamilton's failure to assist Mrs. Hamilton with housekeeping chores. See § 61.13(3)(l).[2] Finally, the court noted that Mr. Hamilton tended to acquiesce to Mrs. Hamilton's wishes. See § 61.13(3)(m).
The court found that all the other statutory factors either were equal as to both parties or favored Mr. Hamilton.[3] For example, the court noted that Mr. Hamilton's family "has a much broader and stronger local presence." See *265 § 61.13(3)(i). The court found that both parties were loving parents who were interested in their daughter's welfare, that the child had a loving relationship with both, that either would provide a stable and loving home, that both had had significant responsibility for their daughter, and that both would foster a relationship between the child and the noncustodial parent. See § 61.13(3)(a), (b), (e), (j).
The court's analysis of the statutory factors reflected that it had serious reservations about Mrs. Hamilton's suitability as a custodial parent. Under the "moral fitness" factor, § 61.13(3)(f), the court discussed Mrs. Hamilton's alcoholism.[4] Although she had successfully maintained sobriety since her treatment, the court wrote, it shared the "concerns of [Mr. Hamilton] and all the testifying experts that any relapse by the [mother] would be detrimental to her and her daughter and would be a significant factor in evaluating her continuing fitness as a parent with primary residential responsibility." In the "mental health" portion of its evaluation, § 61.13(3)(g), the court also observed that Mrs. Hamilton was diagnosed with bipolar disease and had been prescribed psychotropic medications. The court warned that "her continuing compliance with all prescribed medications and therapies would be an absolute requirement for her continuing parental responsibility." Concerning "evidence of domestic violence or child abuse," § 61.13(3)(l), the court found that Mrs. Hamilton had neglected the child before she entered rehabilitation, but it determined that this factor was no longer significant, "as long as the sobriety continues."
In its discussion of "other relevant factors," § 61.13(3)(m), the circuit court expressed respect for Mr. Hamilton's assumption of responsibility for the child during Mrs. Hamilton's periods of "lessened capacity." But the court observed that "nonetheless, it is clear that Mrs. Hamilton had primary responsibility for the child while Mr. Hamilton worked extensively outside the home." Were it not for Mrs. Hamilton's alcoholism, the court wrote, "it can be presumed that that situation would have continued."
Beyond that, the court noted that it gave little weight to the opinion of Herbert Goldstein, Ph.D., who, by stipulation of the parties, had conducted psychological evaluations and made recommendations about the Hamiltons' respective parenting abilities. Dr. Goldstein believed that Mr. Hamilton should be the custodial parent for various reasons, including that he was stable, loyal, considerate, perceptive, and concerned, and that he had the characteristics of a good primary parent. Dr. Goldstein had even considered suggesting that Mr. Hamilton be granted sole parental responsibility. In the court's analysis of the mental health factor, § 61.13(3)(g), it acknowledged Dr. Goldstein's testimony that Mr. Hamilton was "psychologically more well adjusted" than Mrs. Hamilton.
Notwithstanding that the parties themselves chose Dr. Goldstein, the court disagreed with some of his methods, specifically his decision to include psychological profiles of people sharing Mrs. Hamilton's personality traits without specifically applying the profiles to her. The court also disagreed with Dr. Goldstein's analysis of the parties' responses to psychological questionnaires. The court seemed particularly concerned that Dr. Goldstein had not asked Mr. Hamilton why he chose to serve Mrs. Hamilton with divorce papers while she was in the residential treatment *266 facility. In the final judgment the court wrote that it was "frankly surprised" that Dr. Goldstein had made no effort to explore that fact with Mr. Hamilton. Yet, the court admitted that it "subsequently heard testimony from several other witnesses that this circumstance was not as detrimental to Mrs. Hamilton as it sounded." In fact, no one testified that this procedure was detrimental at all. To the contrary, the doctor in charge of Mrs. Hamilton's residential treatment program had advised Mr. Hamilton's attorney that it was a good idea to serve her while she was in the facility, where her resulting stress could be addressed.
The circuit court granted residential responsibility for the parties' child to Mrs. Hamilton. But in doing so, it imposed the following restrictions:
C. Based on the stipulations of counsel, neither party will allow any unsupervised contact between the parties' daughter and the [mother's] oldest son... until further order of the Court.
D. For the first twelve months following the entry of this Final Judgment, the [mother] will undergo, on a monthly basis, an alcohol screening by an accredited lab or treatment program in Pinellas County. A copy of the written results of such testing shall be provided monthly to the [father]. Thereafter, at least once every three months the [mother] shall undergo such screening and provide the written results to the [father].
E. The [mother] shall remain compliant with all medications prescribed for psychological/mental health issues.
The court warned that any noncompliance with these restrictions could be a substantial change in circumstances that would warrant modification of primary parental responsibility.
At the hearing on Mr. Hamilton's motion for rehearing, Mrs. Hamilton conceded that she had failed to obtain the mandated monthly alcohol screenings after the judgment was entered. Her attorney advised the court that he had failed to discuss the requirements carefully with Mrs. Hamilton to ensure that she understood them. The court reiterated its warning that Mrs. Hamilton's failure to honor the conditions imposed in the judgment could result in a change of custody. It also supplemented the judgment with a directive that she submit to testing for compliance with her prescribed medications. In addition, the court imposed more conditions regarding Mrs. Hamilton's sons. It forbade Mrs. Hamilton to permit "any unsupervised contact" between the schizophrenic son and the parties' daughter and emphasized that "unsupervised means at no time should they be alone together whether it's five minutes or five hours." The court further instructed that the son "is not to stay in the same home or location overnight" with the parties' daughter "at any time." The court emphasized that it did not intend to "brand" the schizophrenic son, "but only to focus on [the daughter's] safety issue(s)." The court ordered that neither of Mrs. Hamilton's sons were to "baby sit" the daughter.
We review a trial court's child custody determination for an abuse of discretion. See Cleary v. Cleary, 872 So.2d 299, 301 (Fla. 2d DCA 2004); cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla. 1980). According to the oft-quoted passage from Canakaris, this means that "[i]f reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." 382 So.2d at 1203. Still, in Canakaris the supreme court cautioned that a trial court's discretionary power is *267 not unbridled. Thus, the test of reasonableness requires us to determine whether there is "logic and justification" for the result reached by the trial court. Id.
Here, the evidence and the findings contained in the final judgment established that Mr. Hamilton was an experienced and capable custodial parent who posed no threat to his daughter's well-being. On the other hand, the circuit court determined that Mrs. Hamilton's alcoholism and chronic mental condition had previously endangered the child and posed a threat of doing so in the future. With due regard to the deference we owe the court's exercise of discretion, we find no logic or justification for placing the child with Mrs. Hamilton.
The circuit court's decision cannot be justified by its observation that Mrs. Hamilton would have continued to serve as the child's primary caretaker but for her alcoholism. Certainly, that is true. But the fact is that while serving as the child's caretaker Mrs. Hamilton suffered a relapse after maintaining her sobriety for six years  longer, indeed, than the period the experts testified was predictive of recovery.
Neither can the court's decision be justified by the laundry list of conditions it imposed in order to lessen the danger the court itself perceived. Those requirements are akin to ones that might be imposed on a noncustodial parent who might jeopardize a child and thus is permitted only supervised, conditional visitation. See, e.g., Foerster v. Foerster, 885 So.2d 927, 928-29 (Fla. 2d DCA 2004) (noting that the father's visitation rights with his children depended on his successful completion of various conditions, including providing records of his counseling sessions to a drug evaluator, submitting to a drug screen, and following his counselor's recommendation for drug treatment). Such conditions are inherently limited in their efficacy. Periodic drug and alcohol testing could detect a relapse or a failure to take medication only after it has occurred  perhaps weeks afterward. And, of course, no amount of testing can enforce the conditions regarding Mrs. Hamilton's sons.
Because these requirements were imposed as conditions of custody as opposed to visitation, the court was not in a position to appoint a supervisor to protect the child from inappropriate or dangerous conduct. Thus, under the scheme devised by the court, the principal guardian of this child's safety  the only person truly in a position to monitor compliance with the conditions and report violations on a continuing basis  is the child herself. Even if we could assume that a child of this tender age would possess the acumen to undertake this critical responsibility, which we cannot, we find no justification for placing her in the untenable position of having to report the prohibited acts or omissions of one parent to the other. Cf. Fox v. Fox, 530 So.2d 970, 971 (Fla. 3d DCA 1988) (stating that it is counterproductive to require even a parent to monitor the other's behavior; such an arrangement leaves the court without a neutral and impartial observer to apprise it of the parents' compliance with visitation obligations).
In broad terms, the circuit court was called upon to entrust the residential care of a young child either to an able and willing parent about whom there were no reservations or to a parent whose struggles with alcohol and a chronic mental condition had previously endangered the child and posed an acknowledged threat of doing so in the future. Even with the myriad conditions fashioned by the court  indeed, as evidenced by them  there simply was no logic or justification for choosing the latter.
*268 By no means are we suggesting that Mrs. Hamilton is anything other than a very good parent, or that we believe she will not maintain her sobriety and good mental health in the future. We fully share in the circuit court's appreciation for Mrs. Hamilton's brave effort and impressive progress. Certainly, no one would wish to undermine her recovery. But the child's best interest is paramount as a matter of law, § 61.13(2)(b)(1), and we must be guided by Justice Cardozo's observation, as passed on to us by the supreme court in Canakaris:
The judge, even when he is free, is still not wholly free. He is not a knight-errant roaming at will in the pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the "primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains.
382 So.2d at 1203 (quoting B. Cardozo, The Nature of the Judicial Process 141 (1921)).
The circuit court abused its discretion when it assigned primary residential responsibility for the parties' child to Mrs. Hamilton. See id. at 1203. We reverse that aspect of the final judgment and remand for entry of a judgment placing primary residential responsibility with Mr. Hamilton and making appropriate provisions for visitation and support.
Reversed in part and remanded.
SILBERMAN and WALLACE, JJ., Concur.
NOTES
[1] The father of Mrs. Hamilton's son had died. By the time of the final hearing, the son was residing at a boarding school out of state.
[2] This factor addresses "[e]vidence of domestic violence or child abuse." We question whether the testimony about the husband's poor housekeeping is even a proper consideration under section 61.03(3)(l).
[3] The trial court found that the factors discussed in section 61.13(3)(d), (h), and (k) were not relevant.
[4] We believe Mrs. Hamilton's alcoholism more properly should have been addressed under the "mental health" factor, § 61.13.(3)(g).